**AMEX ASSURANCE CO., Plaintiff,**

v.

**CARIPIDES, et al., Defendants.**

**No. 99 Civ. 3577 CBM.**

United States District Court,
S.D. New York.

Jan. 3, 2002.

Charles Locke, Locke & Herbert, New York City, for AMEX Assurance Co.

Gary Rubin, Stanley L. Meyer, Mazur, Carp & Rubin, P.C., New York City, for Cristina Caripides.

Allen Wasserman, Owen & Davis, PC, New York City, for Estates.

Robert A. Cohen, Debra D. O'Gorman, Dechert, Price & Rhoads, New York City, for Helen Agabides, Ted Caripides, Rita Catar, and Vera Grozdav.

## OPINION

MOTLEY, District Judge.

## I. INTRODUCTION

William and Gabriella Caripides met an untimely death aboard Swissair flight 111 when it crashed near Nova Scotia, Canada, on September 2, 1998. At the time of the tragic event, Mr. and Mrs. Caripides were each covered by two group accidental death insurance policies: one for $100,000 and one for $1,000,000. The couple's surviving relatives are now before this court in an unfortunate and acrimonious dispute over the proceeds of those policies. By stipulation entered into on August 21, 2001, all of the claimants in this interpleader action agreed that the proceeds of the two $100,000 policies should be paid Mr. and Mrs. Caripides's estranged daughter, Cristina. Still at issue, however, are the proceeds of the two $1,000,000 policies.

For the reasons stated in this opinion, this court will order that the net proceeds of Mr. Caripides's $1,000,000 policy be divided equally among his surviving siblings, Ted Caripides, Helen Agabides, and Vera Grozdav. The net proceeds of Mrs. Caripides's $1,000,000 policy are to be divided equally between her mother Rita Catar and the estate of her deceased father Peter Catar.[1] The counterclaims and cross-claims raised by Cristina are without merit and must be dismissed.

## II. BACKGROUND

### A. Procedural History

AMEX Assurance Company ("AMEX") commenced this interpleader action in May 1999 pursuant to 28 U.S.C. § 1335 to determine the rightful beneficiaries of four accidental death insurance policies. In its amended interpleader complaint, AMEX stated that Mr. and Mrs. Caripides were each covered by (1) an AMEX accidental death policy (number AX0948) for $100,000, and (2) an AMEX automatic flight insurance policy (number AX0950) for $1,000,000. *See* Am. Interpleader

---

1. Peter Catar survived Mrs. Caripides but died *pendente lite* in November 1999.

Compl. ¶¶ 12, 14, 19, 21. The amended interpleader complaint named as defendants/claimants Mr. and Mrs. Caripides' sole surviving child, Cristina, and Mr. and Mrs. Caripides's estates ("the Estates").

AMEX deposited the policies' total proceeds of $2,200,000 with the Clerk of the Court, and on August 3, 1999, the court ordered the funds placed into an interest-bearing account. A stipulation and order entered on November 9, 1999, discharged plaintiff/stakeholder AMEX from any liability to the defendants/claimants.

In February 2000, through an affidavit of AMEX Vice President and General Counsel Eric Marhoun, AMEX informed the court that its policy number AX0950 covered only non-New York residents and that it had mistakenly referenced that policy in its amended interpleader complaint. Mr. Marhoun stated that the policy covering New York residents at the time of Mr. and Mrs. Caripides's death was actually AMEX policy number AX0910. Since Mr. and Mrs. Caripides were New York residents at the time of their deaths, they were therefore covered by the AX0910 policy rather than the AX0950 policy. *See* Marhoun 2/17/00 Aff. ¶¶ 2–11.

In June 2000 the court became aware of other potential claimants who had yet to be joined as interpleader defendants. At the time of his death, Mr. Caripides had three siblings—Ted Caripides, Helen Agabides, and Vera Grozdav ("the Siblings"). Mrs. Caripides had no siblings, but she was survived by her parents Rita and Peter Catar ("the Parents").[2] The Siblings and Parents joined this action as pro se litigants in August 2000. The court repeatedly advised the Siblings and Parents

that they would be best served by retaining counsel. The Siblings and Parents declined to follow the court's advice.

In November 2000 the court appointed Mr. Alexander Chernoff, a nonlawyer from the benefits advisory firm Chernoff Diamond & Co., to serve as an expert in the field of insurance and advise the court as to policies at issue in this case. In a Memorandum Opinion and Order dated December 18, 2000, the court confirmed the appointment of Mr. Chernoff, advised the parties of their right to employ their own expert(s), and set a schedule for the submission of expert reports. Mr. Chernoff submitted his report to the court on January 30, 2001. Cristina submitted a report by her own expert, Mr. Martin Minkowitz, Esq., on April 30, 2001. Cristina was also permitted, at her request, to depose Mr. Chernoff. No other parties have submitted an expert report. At a hearing on June 28, 2001, the court heard arguments on the expert reports and allowed the parties to submit replies to Minkowitz's report.

In February 2001 the court granted Cristina's request to conduct limited discovery as to how and why certain provisions of the policies were drafted. In March 2001 the Siblings finally retained counsel—Robert A. Cohen, Esq., of Dechert Price & Rhoads. In July 2001 the court issued an order directing Mr. Cohen to represent Ms. Catar as well.

In July 2001 Cristina filed an amended answer which asserted various counterclaims and cross-claims, though it is not entirely clear from the enumerated counts the bases for these counterclaims and cross-claims. Count I concerns the pro-

---

**2.** As indicated above, *see supra* note 1, Mr. Catar died after AMEX commenced this litigation but before the court learned of the existence of the Siblings and the Parents. While the estate of Peter Catar was never formally joined as an interpleader defendant, the interests of the estate have been adequately represented by his surviving wife and sole heir, Rita. *See* Reznic 10/29/01 Aff. ¶ 7.

ceeds of the two $100,000 policies—an issue rendered moot by the Stipulation and Order entered into by the parties on August 21, 2001. Count II asserts that Cristina is entitled to the proceeds of the $1,000,000 policies if they were AMEX's AX0950 policies. Count III states that if the $1,000,000 policies were AMEX's AX0910 policies, then they are unenforceable under N.Y.Est. Powers & Trusts Law § 13–3.2 and violate New York public policy as expressed in N.Y.Est. Powers & Trusts Law § 4–1.1. Count IV seeks reformation of the policies under various theories, including the doctrines of mistake and unjust enrichment. Count V seeks reformation of the policies under a theory of "constructive fraud." Count VI seeks reformation of the policies, apparently under the same doctrine of mistake articulated in Count IV.

On October 9, 2001, the court, upon its own motion, issued an Order directing the parties to show cause why an order should or should not be issued pursuant to Rule 56 of the Federal Rules of Civil Procedure:

(1) granting summary judgment to AMEX, the Siblings, the Parents, and the Estates on all of Cristina's counterclaims and cross-claims;

(2) awarding the net proceeds of Mr. Caripides's $1,000,000 policy to the Siblings in equal shares;

(3) awarding the net proceeds of Mrs. Caripides's $1,000,000 policy to the Parents in equal shares;

(4) awarding AMEX its taxable costs in this action;

(5) taxing the costs of Mr. Chernoff to the proceeds of the two policies prior to their disbursement; and,

(6) discharging AMEX from further liability to the defendants/claimants in this action.

The Order set a briefing schedule and the court heard oral argument on its motion on November 16, 2001. The court reaches its conclusions below based on the complaint, answers, expert reports and oppositions thereto, letter briefs, oral arguments, and affidavits submitted by the parties to the court.

## B. Factual Background

The background facts are largely undisputed. As indicated above, Mr. and Mrs. William and Gabriella Caripides died in the crash of a Swissair aircraft off the coast of Nova Scotia in September 1998. The plane tickets for the Swissair flight were purchased by Mr. Caripides and charged to his corporate American Express Card.

At the time of their death, Mr. and Mrs. Caripides had two adopted children—Peter, who also died on the Swissair flight, and Cristina, their sole surviving child. Mr. Caripides was also survived by three siblings—Ted Caripides, Vera Grozdav, and Helen Agabides—but his parents predeceased him. Gabriella had no siblings, but she was survived by her parents—Peter and Rita Catar.

At the time of the accident, Cristina was twenty-eight years old and estranged from her parents. The validly executed wills of Mr. and Mrs. Caripides had expressly disinherited Cristina apart from a nominal sum of $10,000. The third article of each will stated: "I intentionally make no provisions, other than those set forth in this subparagraph, for my daughter, CRISTINA CARIPIDES."

## C. The Policies at Issue

Since Mr. Caripides purchased his and his wife's tickets with his American Express card, both of them were covered by the policies at issue in this case. The parties do not dispute that Mr. and Mrs.

Caripides were both covered by AMEX group policy number AX0948 for $100,000 each, nor do they dispute that Cristina is entitled to the proceeds from that policy. There was, however, some initial confusion as to whether the two $1,000,000 policies were AMEX group policy number AX910 or AX0950. As indicated above, when AMEX filed its amended interpleader complaint, it stated that Mr. and Mrs. Caripides were each covered by the AX0950 policy. *See* Am. Interpleader Compl. ¶¶ 14, 21. AMEX later informed the court (and the parties) that the policy in effect at the time of Mr. and Mrs. Caripides death was actually the AX0910 policy. *See* Marhoun 2/17/00 Aff. ¶¶ 3, 8.

Both the AX0910 and AX0950 policies were for $1,000,000, but the two policies differed materially in two ways. First, AX0950 covered only non-New York residents whereas AX0910 covered New York residents. *See id.* ¶¶ 3, 10.

Second, and critically, AX0910 and AX0950 differed as to default beneficiary classes. While both policies permitted the insured to designate a beneficiary, in the absence of such a designation, the policies provided default beneficiary classes. Under the non-New York policy, AX0950, proceeds from the policy would be paid to the first among the following surviving classes: (1) the covered person's spouse; (2) his or her children, including legally adopted children; (3) his or her parents; (4) his or her brothers and sisters; and (5) his or her estate. *See id.* ¶ 13, Ex. E. The New York policy, AX0910, provided for the same beneficiary classes, except that the second class consisted of *dependent* children rather than merely children. *See id.* ¶ 14, Ex. A.

Elsewhere in the AX0910 policy, the term "Dependent Children" is defined as:

unmarried children, step-children, proposed adopted children placed with the Cardmember before finalization of adoption, or legally adopted children under age 19 who are chiefly dependent upon such Cardmember. Any child resident in the State of New York who, prior to attainment of age 19, became so handicapped as to be incapable of self-sustaining employment because of mental illness, developmental disability, mental retardation as defined in the mental hygiene law of the State of New York or physical handicap and who continues to be chiefly dependent upon such Cardmember for support and maintenance, shall be deemed a Dependent Child, regardless of age at the time enrollment for insurance is made.

*Id.* Ex. A.

Mr. Caripides joined the AX0910 policy group in December 1989 when he signed and dated an "Enrollment Request" card. *See* Marhoun 7/19/01 Aff.Exs. B, C. Under the terms of the enrollment card, anytime Mr. Caripides charged airline tickets for himself and his wife, they would be covered by the policy. The enrollment card also provided that "this coverage will replace any coverage previously in effect under the policy." *Id.*

According to AMEX, whenever a cardholder signed and submitted an Enrollment Request card for the AX910 policy, AMEX would, in the ordinary course of business, send the cardholder a "Description of Insurance" brochure. That brochure set forth the default beneficiary provisions of the policy and provided instructions on how the cardholder could change the policy's beneficiary if he or she so desired. *See* Marhoun 2/17/00 Aff. ¶ 5, Ex. B. AMEX has averred (and the parties do not dispute) that AMEX never received any change-of-beneficiary designations from Mr. or Mrs. Caripides. *See* Am. Interpleader Compl. ¶¶ 17, 24.

## III. ANALYSIS

### A. Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to material fact and one or more parties are entitled to judgment as a matter of law.[3] Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must construe the evidence in the light most favorable to the nonmoving parties, drawing in their favor all reasonable inferences therefrom. See Bowman v. Allstate Ins. Co., 238 F.3d 468, 470 (2d Cir.2001) (per curiam). "To defeat a motion for summary judgment, however, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Agugliaro v. Brooks Bros., Inc., 927 F.Supp. 741, 746 (S.D.N.Y.1996) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Rather, the nonmoving party must point to sufficient evidence in the record whereby a jury could return a verdict in its favor, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and that evidence cannot be merely colorable, conclusory, speculative, or insignificantly probative, see id. at 249–50, 106 S.Ct. 2505.

Under New York law, "[t]he construction and interpretation of an unambiguous written contract is an issue of law within the province of the court, as is the inquiry of whether the writing is ambiguous in the first instance." Estate of Hatch v. Nyco Minerals, Inc., 245 A.D.2d 746, 666 N.Y.S.2d 296, 298 (N.Y.App.Div.1997); see W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts."); Highland Sand & Gravel, Inc., v. Squicciarini, 272 A.D.2d 375, 709 N.Y.S.2d 91, 92 (N.Y.App. Div.2000) ("In the absence of any ambiguity, there are only documents to interpret, and the issue is one of law to be determined by the court."). Since the determination of proper beneficiaries under the policies is purely a question of law, "summary judgment is an appropriate device." Martin v. Yellow Freight Sys., Inc., 793 F.Supp. 461, 470 (S.D.N.Y.1992); see also Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co., 775 F.Supp. 606, 609 (S.D.N.Y. 1991).

### B. The Unambiguous Terms of the AX0910 Policy

Under New York law, it is well settled that "a contract is to be interpreted

---

**3.** While Rule 56 speaks in terms of "moving" and "adverse" parties, it cannot be seriously questioned that the court possesses the inherit authority to enter sua sponte an order granting summary judgment when "it appear[s] from the papers, affidavits and other proofs submitted by the parties that there [are] no disputed issues of material fact." Lowenschuss v. Kane, 520 F.2d 255, 261 (2d Cir. 1975); see Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir.1996) ("[A] district court's independent raising and granting of summary judgment ... is an accepted method of expediting litigation."); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). Under the law of this circuit, a district court may sua sponte grant summary judgment to one or more parties provided that the court has afforded all parties ten days notice and an opportunity to oppose the proposed order. See Scottish Air Intern., Inc. v. British Caledonian Group, PLC, 945 F.2d 53 (2d Cir.1991).

so as to give effect to the intention of the parties as expressed in the unequivocal language employed. Thus, clear, complete writings should generally be enforced according to their terms." *Highland Sand & Gravel, Inc.*, 709 N.Y.S.2d at 92; *see also W.W.W. Assocs., Inc.*, 565 N.Y.S.2d 440, 566 N.E.2d at 642 ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

The parties in the instant case do not argue that the clause of the AX0910 policy defining default beneficiary classes is ambiguous. Indeed, the policy could not be clearer:

> If no beneficiary has been designated, or if the designated beneficiary does not survive the Covered Person, the Company will pay equal benefits to the surviving person(s) in the first of the following classes: The Covered Person's 1) spouse; 2) Dependent Children; 3) parents; 4) brothers and sisters; 5) estate.

Marhoun 2/17/00 Aff.Ex. A. Elsewhere in the policy, "Dependent Children" is defined as "unmarried children, step-children, proposed adopted children placed with the Cardmember before finalization of adoption, or legally adopted children under age 19 who are chiefly dependent upon such Cardmember." *Id.* According to the policy, the term "Dependent Children" also includes a Cardmember's adult child who, prior to attaining age 19, became incapable of self-sustaining employment because of mental illness, developmental disability, mental retardation, or physical handicap. *Id.* Under this definition, Cristina Caripides was not a Dependent Child

of Mr. and Mrs. Caripides—she was twenty-eight at the time of their deaths, and there is no evidence that Cristina is mentally, physically, or developmentally disabled.

■ Thus, turning to Mr. and Mrs. Caripides's individual policies, Mrs. Caripides did not have a "surviving" spouse,[4] and she had no "Dependent Children." Mrs. Caripides's did have parents who survived her, Rita and Peter Catar. As indicated above, Mr. Catar died during the course of this litigation. Therefore, under the clear and unambiguous terms of the policy, Rita Catar and the estate of Peter Catar are entitled to the proceeds of Mrs. Caripides's $1,000,000 policy.

Mr. Caripides did not have a "surviving" spouse, he did not have any "Dependent Children," and he had no surviving parents. He did, however, have three surviving brothers and sisters, Ted Caripides, Vera Grozdav, and Helen Agabides. Under the clear and unambiguous terms of the policy, they are therefore entitled to the proceeds of his $1,000,000 policy.

## IV. ARGUMENTS OF THE ADVERSE CLAIMANTS

Notwithstanding the plain and unambiguous language of the AX0910 policy, the adverse claimants—i.e., Cristina and the Estates—argue that they should be awarded the proceeds of the AX0910 policies which covered Mr. and Mrs. Caripides. None of their arguments are persuasive.

### A. Cristina

#### 1. New York State Public Policy

■ Cristina first claims that use of the term "dependent children" in policy

---

4. "It is well settled that where both the insured and the beneficiary die as a result of a common disaster, and a policy of life insurance is, by its terms, payable to the beneficia- ry 'if living,' said beneficiary cannot be said to be 'living' and entitled to the proceeds of the insurance." *In re Macklin's Will*, 177 Misc. 432, 30 N.Y.S.2d 706, 711 (N.Y.Surr.Ct.1941).

AX0910 "grossly violates" New York state public policy. *See* Cristina's Mem. at 8. According to Cristina, the policies should therefore be reformed to strike the word "dependent" from the beneficiary class "dependent children."

Cristina correctly notes that under New York intestacy law, "children," not "dependent children" are default beneficiaries of an intestate decedent's estate. *See* N.Y.Est. Powers & Trusts Law § 4–1.1 ("EPTL"). Thus, Cristina asserts, New York public policy demands that the AX0910 policies be reformed to delete "dependent." However, insurance policies are not governed by intestacy law. Cristina cites no authority for the proposition that an insurance policy may not designate default beneficiaries other than those named ·in EPTL § 4–1.1 or that an insurance policy's default beneficiary provision is somehow overridden by that section of the EPTL. In fact, another section of the EPTL squarely defeats Cristina's assertion: "If a person is entitled to receive ... money payable by an insurance company ... the rights of persons so entitled ... shall not be impaired or defeated by any statute or rule of law governing the transfer of property by will, gift or intestacy." *Id.* § 13–3.2(a).

▪ Furthermore, on January 12, 1989, the AX0910 policies were submitted, as required by New York state law, *see* N.Y.Ins.Law §§ 3201 *et seq.*, for review by the New York Insurance Department.

*See* Marhoun 7/19/02 Aff. ¶ 9. Fredric Bodner, the former chief of the Health and Life Policy Bureau of the New York State Insurance Department, approved the policies on February 10, 1989. *See* O'Gorman Aff.Ex. C.

▪ Cristina, having recently tracked down Mr. Bodner, has submitted an affidavit from him in which he professes his opinion that AMEX apparently "made a mistake" in making the default beneficiary class "dependent children" rather than merely "children." *See* Bodner 4/24/01 Aff. ¶ 7. He bases this opinion on the fact that he "cannot recall having seen another group accident and health policy" with such a default beneficiary class. *Id.* Mr. Bodner goes on to state that,

> If I had been ·made aware that the default beneficiary provision of AX0910 contained the dependent children limitation as part of the default beneficiary provision of the policy, I would have asked the attorney reviewing the policy to notify AMEX of the inconsistent use of the "dependent children" term and suggest that they correct the default beneficiary provision so as to make the provision consistent with the requirements of group accident and health policies as specified in Insurance Law Sections 3221 and 4235(e).

*Id.* ¶ 10. Even assuming that what Mr. Bodner *would have* done has any bearing on the instant litigation,[5] Mr. Bodner fails

5. The court notes that a line of cases on the "filed rate doctrine" suggests that the Insurance Department's review and approval of a policy is presumptively valid and cannot be subsequently judicially challenged as unfair or violative of public policy. *See City of New York v. Aetna Cas. & Sur. Co.*, 264 A.D.2d 304, 693 N.Y.S.2d 139, 140 (N.Y.App.Div.1999); *Byan v. Prudential Ins. Co. of Am.*, 242 A.D.2d 456, 662 N.Y.S.2d 44, 45 (N.Y.App.Div.1997). Courts normally "defer to constructions of statutes by executive branch officials charged with their administration," and a judicial challenge to the Insurance Department's approval of the AX0910 policy can only be maintained if the policy "runs counter to the legislative intent or if it violates existing law." *Burke v. First UNUM Life Ins. Co.*, 975 F.Supp. 310, 316 (S.D.N.Y.1997) (quoting *Durant v. Motor Vehicle Accident Indemnification Corp.*, 20 A.D.2d 242, 246 N.Y.S.2d 548, 555 (N.Y.App.Div.1964), *modified on other*

to aver that he would not have approved the AX0910 policy as submitted by AMEX. Moreover, Mr. Bodner fails to explain how sections 3221 and 4235(e) of New York Insurance Law render the AX0910 policy unenforceable as submitted and approved. The court can fathom no way in which they do.

Likewise, the report of Cristina's expert Martin Minkowitz fails to demonstrate why the default beneficiary clause of the AX0910 policy, as drafted by AMEX and approved by the Insurance Department, should be declared unenforceable. Mr. Minkowitz's conclusions do not differ materially from that of Mr. Chernoff, the court-appointed expert: A death benefit default beneficiary class of "dependent children" is unusual. However, such a designation is not illegal and Mr. Minkowitz cannot point to any New York law prohibiting such a designation.

In sum, Cristina's argument that the AX0910 policy violates public policy is without merit. Count II of Cristina's counter- and cross-claims must therefore be dismissed. Inasmuch as Count IV is premised on a similar argument, it must also be dismissed.

2. The Requirement of a Signed Writing for a Beneficiary Designation

■ Next, citing EPTL § 13–3.2, Cristina argues that the default beneficiary provisions of the AX0910 policies should not be enforced because "the written enrollment form which William apparently executed on or about December 3, 1989, does not include a beneficiary designation or a description of how the insurance proceeds would be paid in the absence of a beneficiary designation." Cristina's Mem. at 11–12. This argument is devoid of any merit.

Section 13–3.2(e) of the EPTL provides that a beneficiary designation must be "made in writing and signed by the person making the designation." Mr. Caripides, however, *never made any beneficiary designation.* Rather, he merely signed the AX0910 enrollment card. AMEX later provided him with a Description of Insurance which detailed the terms of the policy—including the default beneficiary provision. Thus EPTL § 13–3.2(e) is inapposite, as are the cases interpreting that section upon which Cristina relies, *Androvette v. Treadwell,* 73 N.Y.2d 746, 536 N.Y.S.2d 43, 532 N.E.2d 1271 (1988), and *Mohawk Airlines, Inc. v. Peach,* 61 A.D.2d 346, 402 N.Y.S.2d 496 (N.Y.App. Div.1978).

Since Mr. Caripides never made any beneficiary designation, under the terms of the policy, the policy's default beneficiary provisions should apply. The gist of Cristina's argument, however, is that the only legally permissible beneficiaries are those whom a policyholder explicitly names above his or her signature. Cristina is mistaken. If adopted, such a proposition would vitiate any and all default beneficiary provisions in insurance policies; yet, courts routinely enforce such provisions. *See, e.g., Metro. Life Ins. Co. v. Manning,* 568 F.2d 922 (2d Cir.1977); *Hornak v. Hornak,* 101 Misc.2d 335, 420 N.Y.S.2d 964 (N.Y.Sup.Ct.1979); *Metro. Life Ins. Co. v. Trullo,* 95 Misc.2d 556, 408 N.Y.S.2d 680 (N.Y.Sup.Ct.1978). Moreover, section 3220(a)(5) of New York Insurance Law explicitly authorizes group life insurance policies to include some sort of default beneficiary provision. The court is therefore not persuaded by Cristina's argument

*grounds,* 16 N.Y.2d 716, 261 N.Y.S.2d 1028, 209 N.E.2d 565 (1965)). As indicated below, Cristina has failed to demonstrate that the AX0910 policy runs counter to legislative intent or violates existing law.

that EPTL § 13–3.2 renders the default beneficiary provision unenforceable.

### 3. Various Theories of Fraud and Mistake

■■■■ Cristina next argues that the AX0910 policy should be reformed under various theories of fraud and mistake. None of these theories are availing.

■■■■ Generally, a contract entered into under a mutual mistake of fact is subject to rescission or reformation. *See Avery v. Equitable Life Assur. Soc.*, 117 N.Y. 451, 23 N.E. 3, 4 (1889); *Ipar Realty Corp. v. Herbert Const. Co., Inc.*, 192 A.D.2d 639, 596 N.Y.S.2d 466, 467 (N.Y.App.Div.1993). The mutual mistake must have existed at the time the parties entered into the contract, and it must be substantial. *See Ryan v. Boucher*, 144 A.D.2d 144, 534 N.Y.S.2d 472, 472–73 (N.Y.App.Div.1988); *Brauer v. Cent. Trust Co.*, 77 A.D.2d 239, 433 N.Y.S.2d 304, 307 (N.Y.App.Div.1980). Moreover, " '[r]eformation may not be granted upon a probability nor even upon a mere preponderance of evidence, but only upon a certainty of error.' " *Eastern Air Lines, Inc. v. Trans Caribbean Airways, Inc.*, 29 A.D.2d 379, 288 N.Y.S.2d 317, 320 (N.Y.App.Div.1968) (quoting *Amend v. Hurley*, 293 N.Y. 587, 59 N.E.2d 416, 419 (1944)).

Given this heightened standard of proof, the court can only conclude that Cristina has failed to come forward with sufficient evidence to permit a reasonable factfinder to determine that AMEX mistakenly included the "dependent children" provision.

As for Mr. Minkowitz's and Mr. Bodner's belief that AMEX "made a mistake," this has been unequivocally rejected by Mr. Marhoun—someone who, unlike Mr. Bodner and Mr. Minkowitz, would have personal knowledge of why the AX0910 policy included "dependent children" as a beneficiary class. *See* Marhoun 7/19/01 Aff. ¶¶ 14–15.

In addition, Cristina has not produced any evidence of mistake on Mr. Caripides's part. There is no evidence before the court to indicate that Mr. Caripides's intent was to have Cristina, as an *adult* child, benefit from the AX0910 insurance policies. Mr. Caripides never specifically designated Cristina as a beneficiary. Indeed, he never specifically designated anyone as beneficiary. There is no affirmative evidence that Mr. Caripides failed to receive a copy of the "Description of Insurance" that was sent to him or that he did not want the default beneficiary provision to have full effect.[6] Absent any evidence to the contrary, the court can only conclude that Mr. Caripides did not designate a beneficiary because the default provisions of the policy satisfied his desire that his spouse benefit from the policy, and that he had no desire to change the composition and order of subsequent default beneficiaries. Finally, Cristina was estranged from her parents at the time of their death and had been effectively disinherited. Reading the record in the light most favorable to Cristina, she cannot demonstrate to "a certainty of error" that Mr. Caripides intended for Cristina to benefit from the AX0910 insurance policies. Thus Cristina is not

---

**6.** Even if Cristina could somehow demonstrate that Mr. Caripides had failed to read the Description of Insurance, that would not provide a basis to reform the policy. *See Riley v. Life Ins. Co. of N. Am.*, 159 A.D.2d 869, 552 N.Y.S.2d 994, 996 (N.Y.App.Div. 1990) (holding that insured's failure to heed letter describing change in policy negates fraud on part of insurer); *cf. Goldberg. v. Mfrs. Life Ins. Co.*, 242 A.D.2d 175, 672 N.Y.S.2d 39 (N.Y.App.Div.1998) ("Plaintiffs cannot avoid the express terms of the disputed policy by claiming they failed to read the documents they signed and acknowledged as having read and understood.").

entitled to have the AX0910 policies reformed under the doctrine of mutual mistake. Insofar as Counts IV and VI of Cristina's counter- and cross-claims are premised on this theory, they must be dismissed.

■■■ In the alternative, Cristina argues that, under a theory she has termed "constructive fraud," the court should reform the AX0910 contract to replace the limiting term "dependent children" with the less specific term "children." Cristina argues that since a prior automatic flight insurance policy of Mr. Caripides utilized the more general term, the AX0910 contract should be reformed to incorporate this prior language. Cristina cites several cases for the proposition that if, in a renewal of an insurance contract, the insurer materially changes a provision without providing notice to the insured, the court should reinstate the original terms of an insurance policy. *See Hay v. Star Fire Ins. Co.,* 77 N.Y. 235 (1879); *Janes v. N.Y. Cent. Mut. Ins.,* 281 A.D.2d 982, 722 N.Y.S.2d 669 (N.Y.App.Div.2001); *Allstate Ins. Co. v. Young,* 265 A.D.2d 278, 696 N.Y.S.2d 189 (N.Y.App.Div.1999). Even assuming that the AX0910 was merely a "renewal" rather than an altogether different policy,[7] Cristina's reliance on these cases is misplaced.

In *Hay* and *Janes*, the insurer substantially reduced benefits or coverage without alerting the insured of the reduction. Therefore, the New York Court of Appeals and the New York Appellate Division, respectively, held in those two cases that the insurer demonstrated bad faith and that the original terms of the policy would control. *See Hay,* 77 N.Y. at 240; *Janes,* 722 N.Y.S.2d at 670. Likewise, *Allstate Ins. Co.,* concerned a reduction in coverage. *See Allstate Ins. Co.,* 696 N.Y.S.2d at 190. Moreover, in *Allstate Ins. Co.,* the defendant affirmatively denied ever receiving any notification of the modification of the policy. *See id.*

In the instant case, unlike the cases cited by Cristina, there is no evidence of bad faith on the part of the insurer. Cristina theorizes that AMEX's continued presence in this litigation indicates some sinister motive implying bad faith. *See* Cristina's Mem. at 3, n. 3. AMEX no doubt has an interest in enforcing the plain language of its contracts so as to discourage future litigants from suing for reformation. But to impute bad faith to AMEX for simply wanting to honor a policy according to its plain terms strains credulity. The dollar amount already paid by AMEX into the court would have been the same regardless of who is the rightful beneficiary. Moreover, as discussed above, Cristina has produced no evidence of mistake on Mr. Caripides's part. Thus Cristina has no basis for her claim of "constructive fraud" and Count V of Cristina's cross- and counter-claims must be dismissed.

### 4. Other Equitable Theories

■■■ Cristina also asserts a catch-all equitable theory of relief, stating that "equity regards as done that which should have been done." *Simonds v. Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 380 N.E.2d

---

7. Mr. Caripides's prior policy was underwritten by Fireman's Fund Insurance Co. (policy number GA5145). The AX0910 policy, as indicated above, was underwritten by AMEX. The American Express Company, the group policy holder of both policies, canceled the GA5145 policy and replaced it with the AX0910 policy in May 1989. All eligible New York American Express cardholders, including Mr. Caripides, were then resolicited to purchase the new coverage. Mr. Caripides opted for the new coverage when he subsequently signed and returned the enrollment card in December 1989. *See* Marhoun 7/19/01 Aff. ¶ 22.

189, 193 (1978). Cristina brings to the court's attention equitable principles whereby the court can order the creation of a constructive trust in order to prevent unjust enrichment, i.e., where "a party hold[s] property under such circumstances that in equity and good conscience he ought not to retain it." *Dawson v. Vasquez,* 139 Misc.2d 588, 528 N.Y.S.2d 255, 257 (N.Y.Sup.Ct.1988). Cristina claims that the instant case is a typical "laughing heirs" case, and that equity requires that she, an adult child, inherit over more distant relatives—namely, her mother's parents or her father's siblings.

There is no evidence in the record that, as a matter of equity, Cristina is more entitled to the proceeds of the policies than any of the other claimants. Indeed, the evidence indicates the opposite. Cristina was, other than a nominal sum, deliberately written out of both her parents' wills. Moreover, evidence has been presented that Mr. and Mrs. Caripides, until their death, supported Gabriella's parents. *See* Reznic 10/29/01 Aff. ¶¶ 4–6. Finally, Cristina has presented no evidence that her relationship with her parents was any closer than that between her father and his siblings. Cristina has thus failed to demonstrate that equity demands reformation of the policy through the exceptional remedy of the imposition of a constructive trust. *See Simonds,* 408 N.Y.S.2d 359, 380 N.E.2d at 193, *Dawson,* 528 N.Y.S.2d at 257. Insofar as Count IV of Cristina's cross- and counter-claims rely on such a theory, it must be dismissed.

5. Other Purported Issues of Fact

Finally, in an effort to defeat summary judgment, Cristina claims that her Amended Answer "presents material issues of fact which can be decided only by a jury." Cristina's Mem. at 22. The first of these purported "issues of fact" concerns wheth-

er Mr. Caripides had been "properly informed" of the terms of the AX0910 policy. As explained above, AMEX has presented evidence that a Description of Insurance was sent to Mr. Caripides. That three page document presented the terms of the AX0910 policy in clear and unambiguous language. Cristina can point to no evidence to the contrary.

Cristina's second and fourth "issues of fact" concern Mr. Caripides's "intent" with regard to his choice of beneficiaries. As explained above, *see supra* Part III.B, the terms of the AX0910 policy are unambiguous. The court therefore need not inquire further into Mr. Caripides's intent. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 970 F.2d 1138, 1148 (2d Cir.1992) ("Extrinsic evidence is unnecessary where it is determined that the contractual language is unambiguous.").

Cristina's last purported "issue of fact" is whether paragraphs 14, 15, 21, and 22 of AMEX's Amended Complaint constitute an admission by AMEX that Mr. and Mrs. Caripides were covered by policy number AX0950 rather than AX0910. "Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding *on the party who made them,*" *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988) (emphasis added). Cristina, however, seeks to bind her co-claimants, the real parties-in-interest.

The court can fathom no reason to so bind and thereby prejudice Cristina's co-claimants. When AMEX learned of the error in its pleadings, it promptly notified the court by means of an affidavit rather than a formal notice of motion to amend the Amended Interpleader Complaint. It would be grossly unfair to bind Cristina's co-claimants to the fortuitous, purported

admission in AMEX's complaint when the co-claimants could not themselves move to amend AMEX's pleading. *See* Fed. R.Civ.P. 15(a) ("A *party* may amend the *party's* pleading. . . .") (emphasis added). There is no evidence in the record to contradict the representations of AMEX that its error was inadvertent and that Mr. and Mrs. Caripides were covered by the AX0910 policy—not the AX0950 as originally pleaded. *See* Marhoun 2/17/00 Aff. ¶¶ 2–11. Since the language of Rule 15 of the Federal Rules of Civil Procedure indicates that pleadings may be amended "when justice so requires" and when it is "necessary to cause them to conform to the evidence," the court will therefore consider AMEX's complaint so amended. Since the AX0910 policy covered Mr. and Mrs. Caripides, Count II of Cristina's cross- and counter-claims must also be dismissed.

In sum, there are no disputed issues of fact which need to be decided by a jury. Summary judgment is therefore appropriate at this juncture. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

### B. The Estates

#### 1. The Wills as Indicators of Intent

■ The Estates of Mr. and Mrs. Caripides argue that the court should "effecuate [sic] the clearly expressed intent of the decedents" by reforming the AX0910 policies and awarding the proceeds to the Estates (which will, presumably, then distribute the monies to the residuary legatees named in Mr. and Mrs. Caripides's wills). Estates Mem. at 9. As explained above, however, the language of the policy is unambiguous; the court can therefore only assume that it embodies the intentions of Mr. Caripides when he enrolled himself and his wife. *See supra* Part III.B.

■ Nevertheless, relying primarily on *Matter of Estate of Trigoboff*, 175 Misc.2d 370, 669 N.Y.S.2d 185 (N.Y.Surr.Ct.1998), the Estates argue that the court should look to the language of Mr. and Mrs. Caripides's wills to divine their intent. However, it is well settled that unless a will makes a *specific* reference to a policy, any purported change in beneficiary (through a general bequest or residuary clause) is ineffective. *See McCarthy v. Aetna Life Ins. Co.*, 92 N.Y.2d 436, 681 N.Y.S.2d 790, 704 N.E.2d 557, 560–61 (1998); *Kane v. Union Mut. Life Ins. Co.*, 84 A.D.2d 148, 445 N.Y.S.2d 549, 553 (N.Y.App.Div.1981). *Trigoboff* is not to the contrary. The Surrogate in that case noted that "a will that specifically disposes of an unambiguously identified IRA or insurance policy may effectively override a beneficiary designation executed prior to the will." *Id.*, 669 N.Y.S.2d at 187. In that case, the will of the decedent specifically disposed of an unambiguously identified IRA. *Id.* at 186. In the instant case, there is no evidence that Mr. and Mrs. Caripides's wills specifically identified the AX0910 policies. The Estates' argument must therefore fail. None of the other cases cited by the Estates are to the contrary.

#### 2. The Simultaneous Death Provisions of the Wills

■ The Estates next argue that simultaneous death provisions in Mr. and Mrs. Caripides's wills somehow alter the calculus. Mrs. Caripides's will provides that

> In the event that my husband, WILLIAM CARIPIDES, shall have died simultaneously with me, or under such circumstances as to render it impossible or difficult to determine who predeceased the other, then I shall be deemed to have predeceased my husband, WILLIAM CARIPIDES.

Mr. Caripides's will contains a mirror-image provision. The Estates claim that Mr. Caripides should therefore be deemed to have "survived" Mrs. Caripides and vice-versa—in which case Mr. and Mrs. Caripides would appear to have been the beneficiaries of each others' AX0910 policy.

New York law, however, clearly indicates otherwise. Unless the will specifically references the insurance proceeds at issue, any purported testamentary disposition of those proceeds by means of a simultaneous death provision must fail. *See Matter of Cunanan's Will,* 119 Misc.2d 256, 462 N.Y.S.2d 960, 964 (N.Y.Surr.Ct.1983), *remanded on other grounds,* 103 A.D.2d 1039, 478 N.Y.S.2d 431 (N.Y.App.Div.1984).

### 3. The Payment of Estate Taxes

In their Memorandum of Law, the Estates ask that, to insure that applicable estate taxes are paid—regardless of whom the court decides are the proper beneficiaries—the court set aside a portion of the AX0910 proceeds in escrow, "to be disposed of pursuant to order of the Surrogate, Suffolk County, upon a proceeding for the judicial settlement of the account of Frank Zacchino as executor of the estates of William and Gabriella Caripides." Estates Mem. at 6. The Estates seek this relief because the Estate of Mr. Caripides is insolvent and that of Mrs. Caripides is nearly so. If the court does not award the proceeds to the Estates, the Estates will nevertheless be responsible for inheritance and estate taxes, and this, the Estates argue, unfairly burdens the Estates and Mr. and Mrs. Caripides's residuary legatees.

While the court is not unsympathetic to the dilemma faced by the Estates and the residuary legatees, this court is not the proper forum in which to seek the relief they have requested. Under New York's apportionment statute, EPTL § 2–1.8, the Surrogate's Court is the proper forum in which to seek contribution from the beneficiaries. *See also* N.Y. Const. art. VI, § 12(d) (The Surrogate's Court has "jurisdiction over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto...."). Principals of judicial economy also mandate that the Estates seek relief in the Surrogate's Court. The Surrogate, after considering the numerous issues that routinely arise in probate proceedings—such as the validity of the wills, the composition of both probate and non-probate assets, the proper administration of the Estates, etc.—can issue an order requiring the beneficiaries to contribute towards the tax liabilities of the Estates, if such an order would be appropriate. *See* EPTL § 2–1.8(e), (g).

Moreover, the Estates' request is untimely. It should have been asserted as a counter and/or cross-claim in their answer to the complaint (or at least made via a formal motion). As a result of this eleventh hour request, none of the other parties have had a chance to conduct discovery, demand accountings, determine the compositions of the Estates' assets, scrutinize the Estates' tax liabilities, etc.

Thus, on both substantive and procedural grounds, the Estates' request for a set-aside must be denied.

## V. FINAL MATTERS

### A. Costs and Fees

In its Amended Interpleader Complaint, AMEX asks that the court "award[ ] AMEX its taxable costs from the Proceeds." *See* Am. Interpleader Compl. at 5. In October 1999, however, after having deposited the proceeds of the policies into the court, AMEX entered into a stipu-

lation with all the then-claimants whereby it was "discharged from liability in whole to any party in the above-entitled action" and whereby it "shall bear its own costs." Stip. & Order Discharging Pl. 11/5/99. However, after this stipulation and order had been entered, more parties were joined—the claimants to whom the court now awards the proceeds and to whom AMEX is arguably not bound by the stipulation and order.

While a district court does have the discretion to award fees and costs in an interpleader action, *see Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 683 (2d Cir.1989); 4 Moore's Federal Practice § 22.06 (Matthew Bender 3d ed.), this court declines to do so in the instant case. AMEX remained an active participant in this litigation after its discharge in November 1999 primarily because of its discovery in February 2000 that the Amended Interpleader Complaint identified the wrong policy. AMEX has also failed to brief the issue of costs and fees in response to the relief proposed in this court's Order of October 9, 2001. In light of the foregoing, the court will not tax AMEX's costs or fees against the proceeds of the policies.

In their Memorandum of Law, the Estates ask the court to award them their costs and fees against AMEX. The Estates argue that AMEX's error protracted this litigation and that AMEX should therefore reimburse the Estates for their costs and fees. The Estates cite no authority in support of their request.

The court will deny the Estates' request. First, their request is procedurally improper and should have been made through a properly noticed motion. Second, the Estates are estopped from asserting such a claim by the aforementioned stipulation and order entered on November 5, 1999, whereby AMEX was dis-

charged from liability to the then-parties. Finally, the request is without merit. There is no indication that AMEX acted in bad faith or otherwise engaged in sanctionable behavior. In fact, AMEX promptly notified the court once it discovered its error and relatively little had transpired prior to that point.

Each party, therefore, is to bear its own fees and costs in this action.

### B. The Court–Appointed Expert's Fees

Rule 706(b) of the Federal Rules of Evidence provides that an expert's "compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs." The apportionment of such costs is committed to the district court's discretion. *See Leesona Corp. v. Varta Batteries, Inc.*, 522 F.Supp. 1304, 1312 n. 21 (S.D.N.Y. 1981).

Mr. Chernoff has submitted to the court an invoice totaling $16,293.70. The court proposed taxing Mr. Chernoff's fees against the proceeds of the policies in its Order of October 9, 2001. None of the parties opposed the proposed taxation. The court will therefore equally divide the expense of Mr. Chernoff's fees between the proceeds of the two $1,000,000 policies.

### C. The Estate of Mr. Catar

Having determined that Rita Catar and the estate of Peter Catar are entitled to the proceeds of Mrs. Caripides's AX0910 policy, *see supra* Part III.B, the court now considers Rita Catar's request to pay the entire proceeds of the AX0910 policy to her, rather than dividing it equally between her and the estate of her late husband. In support of this request, Mrs. Catar's attorneys have submitted an affidavit from Mrs. Catar's "close personal

friend," Stefan Reznic, in which Mr. Reznic states that Mrs. Catar is the sole beneficiary of Mr. Catar's estate. Mr. Reznic also provides copies of documents (in Romanian) which he claims are Mr. Catar's will and Mrs. Catar's "Heir Certificate," together with "certified" translations thereof. *See* Reznic Aff. 10/29/01 ¶ 7, Exs. B, C. Mrs. Catar cites no authority in support of her request—only that granting it would "achieve a more equitable and expeditious result." Siblings & Parents' Mem. at 17.

The court will deny Mrs. Catar's request. As indicated above, *see supra* Part IV.B.3, this court is not the proper forum in which to examine and meddle with the probation of individual estates—most certainly when foreign law applies. The court is also disinclined to take the foreign documents and translations submitted by Mr. Reznic at face value. Even if the court were inclined to do so, the translations hardly speak for themselves and raise more issues than they resolve. For example, there is a reference to a "successional tax" in the translation of the "Heir Certificate." It is very well possible that under Romanian law the proceeds of Mrs. Caripides's policy are subject to an inheritance tax or that Mr. Catar's estate has other liabilities of which this court is unaware. The court will therefore not award Mr. Catar's estate's share of the proceeds directly to Mrs. Catar.

## VI. CONCLUSION

For the foregoing reasons, the net proceeds of Mr. Caripides's $1,000,000 policy, less one-half of Mr. Chernoff's fees, shall be distributed among the Siblings (Ted Caripides, Helen Agabides, and Vera Grozdav) in equal shares. The net proceeds of Mrs. Caripides's $1,000,000 policy, less one-half of Mr. Chernoff's fees, shall be divided equally between Rita Catar and the estate of Peter Catar. The cross-claims and counterclaims of Cristina Caripides are dismissed with prejudice. An appropriate order is filed herewith.

### ORDER

For the reasons stated in this court's opinion filed herewith on this date, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Ted Caripides, Helen Agabides, and Vera Grozdav are the rightful beneficiaries of William G. Caripides's $1,000,000 AX0910 insurance policy.

2. Rita Catar and the Estate of Peter Catar are the rightful beneficiaries of Gabriella M. Caripides's $1,000,000 AX0910 insurance policy.

3. AMEX Assurance Company is discharged from further liability to the defendants in this action.

4. Cristina Caripides's cross-claims and counterclaims are DISMISSED with prejudice.

5. The Clerk of Court is directed to pay $16,293.70 to the court-appointed expert Alexander Chernoff, one-half of that sum to be deducted from the proceeds of William G. Caripides's policy, one-half to be deducted from the proceeds of Gabriella M. Caripides's policy.

6. The remaining net proceeds of William G. Caripides's $1,000,000 AX0910 policy plus interest accrued thereupon are to be distributed as follows:
   a. One-third to Ted Caripides
   b. One-third to Helen Agabides, and
   c. One-third to Vera Grozdav.

7. The remaining net proceeds of Gabriella M. Caripides's $1,000,000 AX0910 policy plus interest accrued

thereupon are to be distributed as follows:

a. One-half to Rita Catar, and

b. One-half to the Estate of Peter Catar.

8. Each party is to bear its own costs and fees in this action.

9. The Clerk of Court is directed to close this case and remove it from the court's active docket.